UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
                                          :

NANETTE PACE, as Personal         :
Representative of the Estate of     :
Raymond J. Balcerzak, Deceased,  :
                                          :

                          Plaintiff,  :      13 Civ. 6227 (KPF)
                                          :

                    v.                :      <u>OPINION AND ORDER</u>
                                          :

AIR & LIQUID SYSTEMS CORP., *et al.*,  :
                                          :

                   Defendants. :
                                          :
---------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>March 22, 2016</u>

KATHERINE POLK FAILLA, District Judge:

       In a career as an electrician that spanned nearly 50 years, Raymond Balcerzak worked numerous jobs in numerous locations.  In 2011, Balcerzak was diagnosed with lung cancer; in 2014, he passed away.  Prior to his death, in July 2013, Balcerzak filed the instant action in New York State Supreme Court against numerous manufacturers, alleging that his cancer was the product of decades of exposure to asbestos-containing products at his various workplaces.  The case was removed to this Court, and the complaint was thereafter amended twice.[1]

       At the conclusion of discovery, several defendants filed motions for summary judgment; the motions of six of those defendants (collectively,

---

[1]      The second of these amendments followed Balcerzak's death, and involved the substitution of Nanette Pace as the named Plaintiff, the substitution of the term "Decedent" for prior references to Balcerzak as Plaintiff, and the addition of a claim for wrongful death.  For clarity, the Court will use "Plaintiff" to refer to Nanette Pace, and "Balcerzak" to refer to Raymond Balcerzak.  The Clerk of Court is directed to amend the caption in the docket to conform with the caption in this Opinion.

"Defendants") remain pending, namely, those of: (i) Rockwell Automation, Inc., as successor-in-interest to Allen-Bradley Company, LLC ("Allen-Bradley"); (ii) BW/IP International, individually and as successor to Byron Jackson Pumps ("Byron Jackson"); (iii) Air & Liquid Systems, as successor-by-merger to Buffalo Pumps, Inc. ("Buffalo"); (iv) Gardner Denver, Inc. ("Gardner Denver"); (v) Schneider Electric Company, formerly known as Square D Co. ("Square D"); and (vi) Warren Pumps LLC ("Warren").  Defendants contend, among other things, that Plaintiff has failed to raise a genuine issue of material fact that exposure to any of their products was a substantial factor in causing Balcerzak's injuries.  For the reasons set forth in the remainder of this Opinion, the Court grants the motions brought by Buffalo, Gardner Denver, Byron Jackson, Warren, and Square D; and denies the motion brought by Allen-Bradley.

## BACKGROUND

### A.    Factual Background

Between 1957 and his retirement in 2000, Raymond Balcerzak worked at more than 20 different jobs, almost always as an electrician.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 219).[2]  Plaintiff alleges that Balcerzak was exposed to asbestos at

---

[2]    The facts stated herein are drawn from the Second Amended Complaint ("SAC," Dkt. #210); the parties' submissions in connection with the instant motion, including Defendants' joint Local Rule 56.1 statement ("Def. 56.1," Dkt. #264), and Plaintiff's responses thereto ("Pl. 56.1 Response," Dkt. #252-1); Plaintiff's Rule 56.1 Counterstatement ("Pl. 56.1," Dkt. #252-1), and Defendants' responses thereto ("Def. 56.1 Reply," Dkt. #268); the exhibits attached to the Master Declaration of Kardon A. Stolzman ("Stolzman Declaration" or "Stolzman Decl.," Dkt. #252); the exhibits attached to the Affirmations of Joseph P. LaSala ("LaSala Aff.," Dkt. #266) and Tara Pehush ("Pehush Aff.," Dkt. #238); and the exhibits attached to the Declarations of Nicole G. Markowitz ("Markowitz Decl.," Dkt. #236) and Andrew W. Dean ("Dean Decl.," Dkt.

many of these sites during the approximate period spanning 1957 through 1979, with the exception of brief stints working for the City of Phoenix and for Western Electric.  (Def. 56.1 ¶ 13; Pl. 56.1 ¶¶ 220, 240, 262).  In 2006, Balcerzak was diagnosed with emphysema, and in 2011, he was diagnosed with lung cancer.  (Def. 56.1 ¶¶ 17, 19).  His doctors identified asbestos exposure as the cause of his lung cancer.  (Pl. 56.1 ¶ 215).

At base, Plaintiff alleges that Defendants negligently exposed Balcerzak to asbestos-containing products, proximately causing his lung cancer and consequent death.  (SAC ¶ 83).  Because Defendants' motions are largely predicated on claims that Plaintiff has failed to demonstrate Balcerzak's exposure to any of their respective products, the Court outlines the evidence of record concerning that exposure in the remainder of this section.

### 1.   Warren

Plaintiff contends that Balcerzak's earliest exposure to asbestos occurred when he worked as an electrician on board several naval warships.  Balcerzak

---

#230).  References to the transcript of the deposition of Raymond Balcerzak will be referred to as "Balcerzak Tr."

Defendants' opening and reply briefs will be referred to using the conventions "[Moving Defendant] Br." and "[Moving Defendant] Reply," and Plaintiff's opposition briefs will be referred to using the convention "Pl. [Moving Defendant] Opp."

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

enlisted in the U.S. Navy on March 6, 1956, and worked at the Brooklyn Navy Yard as a civilian employee beginning in October 1959. (Def. 56.1 ¶¶ 181, 200).[3]  During his deposition, Balcerzak testified to working aboard two aircraft carriers — the U.S.S. Lake Champlain, on which he worked while serving in the Navy, and the U.S.S. Constellation, on which he worked as a civilian during that ship's construction. (*Id.* at ¶ 179).

Plaintiff has clarified that "as to defendant Warren, plaintiff contends liability arises from [Balcerzak's] exposure on the U.S.S. Constellation." (Pl. Warren Opp. 1 n.1).  In that regard, Balcerzak testified that his job aboard the U.S.S. Constellation involved "pull[ing] wire and cable," in addition to making wire guides and connecting wires to panels. (Def. 56.1 ¶ 201; Pl. 56.1 Response ¶ 201).  While at the Brooklyn Navy Yard, all of Balcerzak's work took place in one of several engine rooms aboard the ship, though he could not recall in which particular engine room. (Def. 56.1 ¶¶ 204-05).

In connection with the instant motions, Plaintiff has claimed that Balcerzak's exposure to asbestos on the carriers occurred as a result of his exposure to pumps containing or insulated with asbestos.  (Pl. Warren Opp. 3).  Balcerzak did not install any pumps on the U.S.S. Constellation, and did not know the function of any pumps that were installed; he did, however, recall others installing the pumps, and specifically recalled observing others

---

[3]   Balcerzak left his job at the Brooklyn Navy Yard in approximately November 1960. (Def. 56.1 ¶ 214).

mounting the pumps and connecting them to pipes, but not opening the pumps.  (Def. 56.1 ¶¶ 209-13).

Understandably, given the nature of his work on the ships, Balcerzak did not know the brand name or manufacturer name for any of the pumps that he saw being installed on the U.S.S. Constellation.  (Def. 56.1 ¶ 207).  At his deposition, Balcerzak thought that he recalled the manufacturer names for two of the pumps on that ship; neither one of those manufacturers was Warren. (*Id.* at ¶ 208).  After the close of discovery, counsel for Plaintiff produced historical ships records for the U.S.S. Constellation and for the U.S.S. Independence, which Plaintiff argues demonstrate that Warren pumps were used in the engine rooms in both ships (including the engine room in which Balcerzak worked).  (*See, e.g.*, Stolzman Decl. Ex. 9-14).[4]

### 2.    Buffalo

Several other pump manufacturers have filed motions for summary judgment based on Balcerzak's failure to identify them as a manufacturer of a pump on either ship on which Balcerzak worked.  With respect to Buffalo, for instance, Balcerzak was unable, throughout his deposition, to identify any products manufactured, sold, or supplied by that company as a source of his asbestos exposure.  (Def. 56.1 ¶ 45).  And although Balcerzak testified to witnessing pipefitters and millwrights perform work on pumps while aboard

---

[4]     Plaintiff suggests that "one can reasonably infer that the installation of the Warren pumps on the USS Constellation mirrored their installation on the USS Independence." (Pl. Opp. 4).  The Court is less convinced, since the exhibits to the Stolzman Declaration make clear that the Constellation was a *Kitty Hawk*-class carrier and the Independence was a *Forrestal*-class carrier.  (*Compare* Stolzman Decl. Ex. 9, *with id.* Ex. 11).

two U.S. Navy ships, he did not know the brand or manufacturer of these pumps.  (*Id.* at ¶¶ 46-50).

### 3.    Byron Jackson

Similarly, at his deposition, Balcerzak could not identify any product manufactured by Byron Jackson as a possible source of his exposure to asbestos.  (Def. 56.1 ¶¶ 53-54).  Balcerzak recalled observing millwrights and pipefitters on the U.S.S. Constellation working on pumps; he did not, however, recall the brand name, trade name, or manufacturers' names of those pumps. (*Id.* at ¶¶ 68-69).  As noted, Balcerzak's only duty on that ship was "pulling wire" and "pulling cable," and he neither installed nor knew the function of such pumps.  (*Id.* at ¶¶ 61, 70).

On May 9, 2014, Byron Jackson's counsel served a Stipulation of Discontinuance on Plaintiff's counsel, on the ground that there had been no product identification of anything manufactured by Byron Jackson.  (Def. 56.1 ¶ 56; Markowitz Decl. Ex. A).  On May 27 and June 30, 2014, Byron Jackson's counsel served two further Stipulations of Discontinuance.  (Def. 56.1 ¶ 56).  In response, on July 16, 2014 — two months after the close of document discovery — Plaintiff forwarded to Byron Jackson's counsel a single-page ship record that referenced "re-testing the Byron Jackson/Hardie Tynes main feed pump" aboard the U.S.S. Constellation.  (*Id.* at ¶¶ 57-59; Markowitz Decl. Ex. B).  However, the record does not indicate the location of any Byron Jackson pump aboard that ship or the date of its installation.  (Def. 56.1 ¶ 59).

### 4.    Gardner Denver

As with the other pump manufacturer Defendants, Balcerzak did not identify any Gardner Denver product as a source of his alleged asbestos exposure.  (Def. 56.1 ¶¶ 131-32).  On May 22, 2014, and again on July 18, 2014, Gardner Denver's counsel served Stipulations of Discontinuance on Plaintiff's counsel, on the ground that Plaintiff had not identified any Gardner Denver product as a source of Balcerzak's asbestos exposure.  (*Id.* at ¶ 135; Dean Decl. Ex. D).  On July 16, 2014, following the close of fact discovery, Plaintiff also sent Defendant Gardner Denver a purported Navy ship record, titled "Data of Pumps, Blowers, and Compressors," allegedly indicating that Gardner Denver pumps were installed aboard the U.S.S. Lake Champlain. (Def. 56.1 ¶¶ 136-38; Dean Decl. Ex. E).[5]

### 5.    Square D

While Balcerzak had difficulty identifying the relevant pump manufacturers, his memory was stronger with respect to other electrician's products with which he worked in the course of his career.  With respect to movant Square D, Balcerzak recalled first that he worked with Square D's "limit switches,"[6] though he did not believe these items exposed him to asbestos.  (Def. 56.1 ¶¶ 164-65).  Balcerzak further testified that he worked on

---

[5]    Gardner Denver notes that in a separate New York State Court action, *Bickel* v. *Air & Liquid Sys. Corp.*, Index No. 190311/10 (N.Y. Sup. Ct. June 14, 2012), Justice Sherry Klein Heitler found this particular document insufficient to create a material fact on summary judgment as to that plaintiff's exposure to Gardner Denver asbestos-containing products.  (Def. 56.1 ¶¶ 139-41; Dean Decl. Ex. H).

[6]    Balcerzak described limit switches as devices that would be "actuated at a certain time to tell [an electrical] panel what to do."  (Balcerzak Tr. 538).

or was present when others worked on Square D-manufactured "switchgear" or "distribution panels,"[7] along with their component arc chutes and Bakelite insulation backing, throughout his career as an electrician and in the U.S. Navy. (*Id.* at ¶¶ 169, 171, 173).[8]  He believed these products exposed him to asbestos. (*Id.* at ¶ 169).

Balcerzak could not specifically identify at which jobs he worked with or around Square D switchgear and other equipment, remarking instead that such contact occurred "through [his] entire career," with the exception of six-month stints at the City of Phoenix and Western Electric. (Def. 56.1 ¶¶ 167, 170; Pl. 56.1 Response ¶¶ 167, 170; Pl. 56.1 Opp. ¶ 243).  Balcerzak believed that he was exposed to asbestos from these Square D products during his time in the Navy based on a brochure he had read on the Internet at some point during the three years prior to his deposition. (Def. 56.1 ¶ 177).

### 6.    Allen-Bradley

Finally, with respect to movant Allen-Bradley, Balcerzak testified that he was exposed to asbestos through inspection and maintenance of Allen-Bradley arc chutes and switchgear. (Def. 56.1 ¶ 22).  Balcerzak confirmed that he understood switchgear to be "high-voltage" equipment "that would be accepting

---

[7]    Balcerzak testified, during his deposition, that he used the terms "switchgear" and "distribution panels" interchangeably. (Balcerzak Tr. 613-14).  For simplicity, the Court uses the term "switchgear" in the remainder of this Opinion.

[8]    The parties dispute whether Balcerzak was able to identify Square D as the manufacturer of the alleged asbestos-containing arc chutes. (Def. 56.1 ¶ 172; Pl. 56.1 Response ¶ 172).  For purposes of this motion, taking the facts in the light most favorable to Plaintiff, the Court assumes that Square D manufactured the component arc chutes included in the subject switchgear.

power from the outside and sending it out to a building or location." (*Id.* at ¶ 23). He then clarified that this switchgear ranged in voltage from 480 to 13,800 volts. (Pl. 56.1 Opp. ¶ 23). Defendant Allen-Bradley has submitted evidence demonstrating that it did not manufacture any switchgear resembling that described by Balcerzak. (Def. 56.1 ¶ 24; LaSala Aff. Ex. S ¶ 7).

In addition to switchgear, Balcerzak testified that he was exposed to asbestos while removing, repairing, and replacing arc chutes in Allen-Bradley contactors. (Def. 56.1 ¶ 26).[9] Balcerzak described removing the arc chutes from these contactors, visually inspecting them, replacing them if damaged, and reinstalling them. (Pl. 56.1 Response ¶ 27). When asked whether these arc chutes would simply "snap out and snap back in," Balcerzak stated "[m]ost of them just snap in, snap out." (*Id.*). Additionally, Balcerzak claimed that he was exposed to asbestos by removing and replacing a Bakelite substance on the backing of Allen-Bradley contactors. (Def. 56.1 ¶¶ 30-32, 35).

Defendant Allen-Bradley asserts that Balcerzak could not have been referring to Allen-Bradley arc chutes in its contactors, as the company's arc chutes did not "snap in, snap out." (Def. 56.1 ¶¶ 28, 29). Further, Allen-Bradley argues that its contactors were designed with metal backing in order to preclude the need for Bakelite insulation, and thus, any use of Bakelite on its contactors was an unintended alteration. (*Id.* at ¶¶ 38, 41-43).

---

[9]     In his deposition, Balcerzak described contactors as devices designed to "allow electricity to pass"; when the two parts of a contactor "[come] into contact with each other, it [will] produce a voltage and a flow of current." (Balcerzak Tr. 1086, 1121). This equipment would "run some type of motor or start and stop some piece of equipment." (*Id.* at 935).

B.      **Procedural Background**

On July 25, 2013, Balcerzak filed his complaint in the New York State

Supreme Court, New York County, designated as an "Asbestos Matter," against

28 manufacturers or their successors.  (Dkt. #1-1).  The matter was removed to

this Court on September 4, 2013.  (Dkt. #1).  An initial pretrial conference was

held on October 17, 2013 (Dkt. #11), and a case management plan (with

discovery schedule) was endorsed by the Court on December 9, 2013.  (Dkt.

#45).  The case management plan specified that fact discovery in the matter

would conclude on May 16, 2014 (*id.*); by Order dated May 13, 2014, the Court

extended the discovery deadline until July 11, 2014, only for the limited

purpose of completing certain fact depositions.  (Dkt. #125).

On February 28, 2014, Balcerzak filed his First Amended Complaint.

(Dkt. #78).  In it, he alleged causes of action for negligence, breach of implied

and express warranties, failure to warn, fungible products, and unsafe

workplace.  (*Id.*).  On March 3, 2015, after Balcerzak had passed away, Nanette

Pace was substituted in as Plaintiff and filed a Second Amended Complaint,

alleging the same claims as the First and adding a cause of action for wrongful

death.  (Dkt. #210).

The Court instructed those defendants contemplating a motion for

summary judgment to file pre-motion submissions on or before September 4,

2014.  (Dkt. #147).  A pre-motion conference was then held on October 22,

2014.  (Dkt. #184, 192, 200).  Several defendants filed motions but resolved the

cases against them by means of stipulations of dismissal.  What remains are Defendants' motions for summary judgment.

**DISCUSSION**

**A.    Applicable Law**

    **1.    Motions For Summary Judgment Generally**

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in

11

his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed

facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### 2.    Asbestos Exposure Liability Under New York Law

In the Second Amended Complaint, Plaintiff brings negligence-based products liability claims against all Defendants for proximately causing Balcerzak's death by designing, processing, manufacturing, packaging, distributing, delivering, and/or installing asbestos-containing products to which Balcerzak was exposed.  (SAC ¶ 97).  Plaintiff also alleges (i) breaches of implied and express warranties that asbestos and asbestos-containing products were of good and merchantable quality and fit for intended use (*id.* at ¶ 105); (ii) failure to warn of the dangers of asbestos and asbestos-containing products (*id.* at ¶¶ 111-12); (iii) fungible products (*id.* at ¶ 120);[10] (iv) unsafe workplaces (*id.* at ¶ 135);[11] and (v) wrongful death (*id.* at ¶ 150).

---

[10]    Neither the parties nor the Court has identified any cases in which the Second Circuit has applied a "fungible products" or market share-type theory for a plaintiff's asbestos exposure, and courts within New York and outside of this Circuit tend not to apportion market share liability.  As one New York State court has explained on this point:

> Many courts have rejected market share theory for asbestos products on the ground that the products are not fungible … asbestos is not a generic product made from one formula.  Asbestos is manufactured from many different fibrous minerals, mined in different locations.  Each of these minerals has a different toxicity.  In addition, asbestos is used in many different products in many different percentages.  As product design and product use varies, allowing more fibers or fewer fibers to become airborne when the product is used, the risk of harm of these asbestos products varies, reducing fungibility.

*In the Matter of N.Y. State Silicone Breast Implant Litig.*, 631 N.Y.S. 2d 491, 493-94 (N.Y. Sup. Ct. 1995) (collecting cases).

[11]    Because Defendants are manufacturers of products with which Balcerzak allegedly worked, rather than his employers, the Court need not consider Plaintiff's unsafe

At the outset, to make out a claim for products liability under New York law, a plaintiff must prove that "he was exposed to [the defendant's] merchandise and that it is more likely than not that this exposure was a substantial factor in his injury." *Johnson* v. *Celotex Corp.*, 899 F.2d 1281, 1285-86 (2d Cir. 1990) (citing *Derdiarian* v. *Felix Contracting Corp.*, 51 N.Y.2d 308 (1990)). Typically, a plaintiff must "establish that his injury was proximately caused by [the defendant's] asbestos and produce evidence identifying each [defendant's] product as being a factor in his injury. *Id.* at 1286 (citing *Hymowitz* v. *Eli Lilly & Co.*, 73 N.Y.2d 487 (1989)).

Nonetheless, "it is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts," and "[a]sbestos cases are no exception to that proposition." *O'Brien* v. *Nat'l Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991). As asbestos-related injuries may not manifest for decades after exposure, courts recognize the difficulty faced by plaintiffs of "identify[ing] the exact manufacturers whose products injured" them; thus, the Second Circuit will "find[] proof of causation sufficient in the absence of identification of the precise product that injured a given plaintiff." *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 836-37 (2d Cir. 1992); *see also Johnson*, 899 F.2d at 1286-87 (upholding jury verdict and finding that circumstantial evidence proved causation where 11 fellow Brooklyn Navy Yard employees corroborated the presence of the defendants' asbestos products aboard

---

workplace claim under the New York Labor Law and the New York Industrial Code as against any of these Defendants.

particular ships during the time period the plaintiff worked on them); *Kreppein* v. *Celotex Corp.*, 969 F.2d 1424, 1426 (2d Cir. 1992) (finding "proof of causation sufficient notwithstanding" the lack of exact product identification where (i) the plaintiff's coworker testified to the presence of the defendant's asbestos products and the dust they emitted at one worksite, (ii) evidence showed that employees like the plaintiff were exposed to asbestos dust from the defendant's products at two other worksites, and (iii) evidence showed the plaintiff breathed asbestos dust from the defendant's products at a fourth worksite); *O'Brien*, 944 F.2d at 72-73 (holding that causation was established where the plaintiff proved that (i) the decedent contracted a disease caused only by asbestos, (ii) the decedent's only known exposure occurred at Brooklyn Navy Yard, and (iii) asbestos products, including the defendant's, "were used interchangeably on virtually all of the warships under construction" there).

Still, "the plaintiff must show *some* circumstantial evidence that he was at the approximate place and approximate time during which the defendant's product was used." *In re Joint E. & S. Dist. Asbestos Litig.*, No. 92 Civ. 1113 (RWS), 1993 WL 97301, at *2 (S.D.N.Y. Mar. 30, 1993) (emphasis in original). If a plaintiff fails to provide "responses to interrogatories or deposition testimony as to the location or timing of his alleged exposure to [the defendant's] products," he then "fail[s] to state sufficient facts upon which to base liability." *Scheidel* v. *A.C. & S. Inc.*, 685 N.Y.S.2d 829, 831 (3d Dep't 1999) (citing *In re New York City Asbestos Litig.*, 628 N.Y.S.2d 72, 80 (1st Dep't 1995)).

Defendants have attempted to discharge their burden under Rule 56 by challenging Balcerzak's product identification, arguing that upon the evidence presented, Plaintiff has failed to show Balcerzak's exposure to their respective products. In consequence, Plaintiff must put forth evidence sufficient to raise a triable issue of fact as to each Defendant's liability for exposing Balcerzak to asbestos. If Plaintiff fails to present sufficient evidence establishing exposure, the Court need not address Plaintiff's related claims against Defendants for breach of warranties, failure to warn, fungible products, or wrongful death.

### 3.    Asbestos Exposure Liability Under Maritime Law

Certain Defendants allege that Plaintiff's claims against them arise under maritime law. (*See* Warren Br. 11-12; Buffalo Br. 2). "General maritime law provides a cause of action for product liability, brought either under a theory of negligence or strict liability." *Bray* v. *Ingersoll-Rand Co.*, No. 13 Civ. 1561 (SRU), 2015 WL 728515, at *4 (D. Conn. Feb. 19, 2015). To determine whether an alleged tort arises under maritime law, the Second Circuit has adopted the test first articulated by the Supreme Court in *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), and described more recently by the Circuit in *Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 248 (2d Cir. 2014):

> First, we ask whether the alleged tort meets the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water. Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character

of the activity giving rise to the incident bears a
substantial relationship to traditional maritime activity.
Only if the location test and both subparts of the
connection test are met will admiralty tort jurisdiction
be proper under 28 U.S.C. § 1333(1).

*Id.* (internal citations omitted).

The Second Circuit has stated that "contracts for shipbuilding, contracts
to supply materials for ship construction[,] and warranties arising under such
contracts" are "non-maritime." *Keene Corp.* v. *United States*, 700 F.2d 836,
844 (2d Cir. 1983). "Indeed, a tort arising out of work on an uncompleted
vessel has been held to fall outside admiralty jurisdiction. General allegations
that the contacts with asbestos took place in shipyards or even aboard
launched vessels are thus insufficient to establish admiralty jurisdiction." *Id.*
(internal citations omitted). Although *Keene* suggests that maritime
jurisdiction might lie where a product is "designed specifically" for marine use,
the Court has not defined outright what such products might be. *Id.*

**B.    Analysis**

**1.    Summary Judgment Is Warranted as to Warren**

Defendant Warren seeks summary judgment on the ground that there is
"no material issue of fact as to whether a product for which Warren can be held
legally responsible was a proximate cause of [Balcerzak's] alleged injuries."
(Warren Br. 5). Given the paucity of evidence connecting any Warren product
to Balcerzak's employment at the Brooklyn Navy Yard or anywhere else, the
Court agrees.

### a.   Exhibits 9-16 to the Stolzman Declaration Will Not Be Considered by the Court

Preliminarily, Warren argues — and Plaintiff does not contest — that Exhibits 9 through 16 of the Stolzman Declaration were not produced to Defendants during discovery and are therefore inadmissible.  (Def. 56.1 Reply ¶¶ 277-85).  In particular, Warren contends that Plaintiff acknowledged the lateness of the production during the October 22, 2014 pre-motion conference before the Court:

> During the argument of the pre-motion letters, all parties, including Plaintiff's attorney stated that discovery was completed.  Plaintiff's attorney clearly had an opportunity at that point to request that the additional so-called evidence now attached to Plaintiff's Opposition be disclosed in order to support Plaintiff's opposition to Warren's Motion for Summary Judgment, the substance of which was outlined in the pre-motion letter and during oral argument.  Because it does not appear that there is any substantial justification supporting Plaintiff's non-disclosure of the 8 new exhibits, this evidence should not be considered by this Court when ruling upon Warren's Motion for Summary Judgment.

(Warren Reply 2-3 n.1).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "The intention of this preclusionary measure is to prevent the practice of 'sandbagging' an opposing party with new evidence, and it applies on motions for summary

judgment." *Hooks* v. *Forman Holt Eliades & Ravin LLC*, No. 11 Civ. 2767 (LAP), 2015 WL 5333513, at *4 (S.D.N.Y. Sept. 14, 2015).

"In determining whether to exclude evidence under this standard, a district court considers a nonexclusive list of four factors: (i) the party's explanation for its failure to disclose, (ii) the importance of the evidence, (iii) the prejudice suffered by the opposing party, and (iv) the possibility of a continuance." *523 IP LLC* v. *CureMD.Com*, 48 F. Supp. 3d 600, 634 (S.D.N.Y. 2014). Beginning with the first of those factors, Plaintiff here has provided no explanation for her failure to disclose the additional documents appended to the declaration; in fact, in her opposition, Plaintiff does not even acknowledge Defendants' repeated objections, articulated in the 56.1 Reply, to consideration of these materials. "The burden to prove substantial justification or harmlessness rests with the dilatory party." *Schiller* v. *City of New York*, Nos. 04 Civ. 7921, 7922 (RJS) (JCF), 2008 WL 4525341, at *3 (S.D.N.Y. Oct. 9, 2008). The "complete lack of explanation thus weighs in favor of preclusion." *523 IP LLC*, 48 F. Supp. 3d at 638.

With regard to the second factor, the additional exhibits indeed serve an important role in Plaintiff's Opposition, as they purport to bolster Plaintiff's contentions that: (i) the U.S.S. Constellation was under construction at the Brooklyn Navy Yard during Balcerzak's tenure there; (ii) the U.S.S. Constellation and the U.S.S. Independence — also at the Navy Yard during that time — contained the same type of Warren-manufactured pumps; (iii) the manuals for those pumps indicated that they were installed in all four of the

engine rooms on each ship; and (iv) therefore, the Court can infer that the one engine room in which Balcerzak worked must have contained a Warren pump. (Pl. Warren Opp. 3-5).

Conversely, the prejudice to Defendant stemming from Plaintiff's failure to disclose these documents during discovery is substantial:  Warren was unable to conduct responsive discovery into these documents or to discuss them with Balcerzak during his deposition, necessarily (and, it is submitted, unfairly) compromising its ability to bring the instant motion; Warren would clearly be harmed by their consideration.  The Court believes this disclosure, post-dating the close of discovery and Balcerzak's lengthy deposition and *de bene esse* testimony, embodies the precise "sandbagging" sought to be prevented by the Federal Rules of Civil Procedure.  *See Hooks*, 2015 WL 5333513, at *4.

Finally, the Court has considered the possibility of a continuance.  This matter was initially filed in September 2013; document discovery concluded in May 2014, nearly two years ago.  (Dkt. #125).  To reopen discovery now, after Balcerzak's death and after so much time has passed, would constitute an unwarranted delay and weighs in favor of preclusion.

Thus, three of the four factors weigh heavily against consideration of Plaintiff's additional evidence.  Although the documents could serve an important role in Plaintiff's case, no justification has been proffered for their introduction at this late stage, and their consideration would substantially

20

prejudice Warren.  Accordingly, the Court will not consider Exhibits 9 through 16 of the Stolzman Declaration in evaluating this motion.[12]

> **b.   Plaintiff Has Not Established a Genuine Issue of Material Fact, Whether Considered Under Maritime Law or New York Law**

An additional preliminary issue concerns the proper law to apply.  In the Second Amended Complaint, Plaintiff alleges that Warren's liability for Balcerzak's asbestos exposure stems only from the latter's work on the U.S.S. Constellation at the Brooklyn Navy Yard.  (Pl. Warren Opp. 1 n.1). Because this claimed exposure occurred aboard a naval warship, Warren contends, maritime law should apply.  (Warren Br. 11).

In evaluating whether Warren has established that Balcerzak's alleged exposure meets both the location test and the connection test discussed *supra*, the Court finds immediate difficulty with the first prong — whether the alleged tort "occurred on navigable water or was caused by a vessel on navigable water." *Tandon*, 752 F.3d at 248.  During his deposition, Balcerzak did not recall at "what stage" of construction the U.S.S. Constellation was during his employment, stating: "I don't know what stage it was in, and I don't know how long it was going to continue.  *I know it continued a long time after I left.*" (Balcerzak Tr. 390 (emphasis added)).  Balcerzak also indicated that, during the time he worked as an electrician on the U.S.S. Constellation, "the ship wasn't in operation." (*Id.* at 1020).  Viewing the facts in the light most

---

[12]   As discussed *infra*, late-produced documents are also implicated by the motions of Defendants Buffalo, Gardner Denver, and Byron Jackson.  For similar reasons, these documents are not considered with respect to those motions.

favorable to Plaintiff, the Court finds that the U.S.S. Constellation was under construction at the time Balcerzak worked on the ship as an electrician.  As a result, under *Keene*, 700 F.2d at 844, the Court finds that Plaintiff's claims against Warren do not arise under maritime law.  Ultimately, however, this issue is irrelevant, as Plaintiff's claims against Warren fail even under the more liberal New York standard for asbestos exposure.[13]

In Balcerzak's "Jobsite Specific Exposure History," disclosed in response to another defendant's Request for Interrogatories and Requests for Production, he indicated that while working for the U.S. Navy, he "was exposed to asbestos-containing products, including but not limited to, turbines, boilers, valves, gaskets, packing, steam traps, motors, [and] wire electrical panels." (LaSala Aff. Ex. F).  The same chart indicates that Balcerzak did not recall, at that time, the names of any other workers or supervisors on that job site.  (*Id.*).

In his deposition, Balcerzak testified that he worked as an electrician's helper on the U.S.S. Constellation, "pulling wire" and "pulling cable" in one of the ship's engine rooms.  (Balcerzak Tr. 377, 381, 389-90).  He later testified that he also made "wire guides" and connected wires to panels.  (*Id.* at 423-24).  Balcerzak spent about half of his time working in one of the four engine rooms

---

[13]    In its moving papers, Warren argues that, under maritime law, "a showing of minimal exposure or that 'defendant's product was present somewhere at plaintiff's place of work is insufficient,'" and "the plaintiff must ... show ... a substantial exposure for a substantial period of time." (Warren Br. 14 (citing *Lindstrom* v. *A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005))).  Under New York law, in contrast, Plaintiff need only prove that Balcerzak "was exposed to the defendants' products and that it is more likely than not that this exposure was a substantial factor in his injury."  *In re Joint E. & S. Dist. Asbestos Litig.*, 1993 WL 97301, at *1.

on the ship and the other half of his time in the "guided missile room."  (*Id.* at 382).  He did not work on any other ships or have any other duties while working at the Brooklyn Navy Yard.  (*Id.* at 382, 424-25).

With respect to his work in the engine room, Balcerzak also testified that he witnessed electricians and millwrights installing pumps, but he did not know "the brand name, trade name, or manufacturers' names of the pumps." (Balcerzak Tr. 405-06).  When pressed, Balcerzak responded, "I'm not sure. But Ingersoll Rand comes to mind, or Worthington."  (*Id.* at 406).  Balcerzak indicated that he believed the motors in the engine room were manufactured by "mostly GE, Westinghouse," and he recalled only GE as a manufacturer of wiring for which he was responsible.  (*Id.* at 384, 406).  He further stated that while he observed others insulating pipes that were attached to pumps, he did not know the brand or manufacturer of the insulation.  (*Id.* at 1022).

Warren argues that summary judgment is warranted because Balcerzak "never identified Warren as a manufacturer of pumps that he alleges contributed to his alleged asbestos exposure while in the United States Navy and while working at the Brooklyn Navy Yard."  (Warren Br. 5).  In opposition, Plaintiff argues that Warren admits to "sell[ing] various pumps for use on the USS Constellation where Mr. Balcerzak contends he was exposed while working to build the ship as a civilian electrician's helper."  (Pl. Warren Opp. 1). However, Plaintiff fails to substantiate this claim with any admissible

evidence.[14]  Notably, Balcerzak did not mention Warren at any point during the course of his eight days of deposition testimony or his *de bene esse* deposition.

Somewhat curiously, Plaintiff argues that summary judgment must be denied because "Warren has not presented any affirmative evidence that Mr. Balcerzak did *not* work[] in the vicinity where Warren's pumps were used or which shows that [he] was *not* exposed to defendant's pumps." (Pl. Warren Opp. 9 (emphases added)).  This misstates Warren's burden; to succeed on its motion for summary judgment, Warren need not present affirmative evidence excluding the presence of its products.  *See Celotex*, 477 U.S. at 322 (the movant discharges its burden if it shows the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").  On the contrary, Warren has demonstrated that Plaintiff failed to adduce evidence to create an issue of material fact.  Absent any identification of Warren's products, allowing Plaintiff to defeat summary judgment here would require resort to "mere speculation [and] conjecture as to the true nature of the facts." *Knight*, 804 F.2d at 12.

---

14      Plaintiff states, "[a]s Warren also does not dispute, historical ship records provide evidence that Warren's pump products were sold for use on the construction of the USS Constellation," and "this key evidence is [inexplicably] omitted from the Defendants' Joint Rule 56.1 Statement of Uncontested Facts." (Pl. Warren Opp. 3, 8-9).  For this proposition, Plaintiff cites to the excluded exhibits from the Stolzman Declaration.  (*Id.*).  As it happened, Warren vigorously contested these facts by arguing, in its 56.1 Reply, that these documents were undisclosed during discovery and therefore not admissible. (Def. 56.1 Reply ¶¶ 277-85).  Given the Court's agreement that the documents are inadmissible, it will not accept as true Plaintiff's contention that Warren "admitted" to selling pumps to the U.S.S. Constellation.

Thus, because Plaintiff has offered no admissible evidence tying Warren's products to Balcerzak's tenure at the Brooklyn Navy Yard — not even an allegation by Balcerzak himself — the Court would be hard-pressed to determine that a reasonable jury could return a verdict for Plaintiff. Accordingly, Warren's motion for summary judgment is granted.[15]

### 2.    Summary Judgment Is Warranted as to Square D

Defendant Square D likewise seeks summary judgment on the ground that "Plaintiff has failed to identify an actual Square D product, much less an asbestos-containing product, to which he was allegedly exposed." (Square D Br. 2).  Further, Square D argues that Plaintiff "has provided no evidence to connect any allegedly injurious product to any period of time, employer, or location," as Balcerzak claimed that "all manufacturer defendants were represented at all worksites throughout his forty-four year career." (*Id.* at 5). The Court agrees with the latter argument, and for this reason grants Square D's motion.

### a.    Plaintiff Has Adequately Described the Square D Products at Issue

At the outset, Square D contends that Plaintiff has failed to meet the standard for product identification:  Because Plaintiff refers only to Balcerzak's exposure through Square D's "switchgear" — which the company calls "a

---

[15]    Because Plaintiff fails to establish the threshold issue — exposure to Warren's pumps — the Court need not consider Plaintiff's other argument in opposition to summary judgment, namely, that Balcerzak was also exposed to asbestos-containing insulation applied to Warren's pumps, a foreseeable alteration for which Warren would be liable.  (Pl. Warren Opp. 11).

general product category that could contain any number of electrical equipment products" — Square D argues that Plaintiff has not demonstrated that any of its products caused Balcerzak's alleged injuries.  (Square D Br. 1). In support of this contention, Square D attaches a company product catalog from 1975, spanning over 400 pages; the catalog contains an index of products, ordering information, use instructions, and more.  (Pehush Aff. Ex. A).  Square D argues that the catalog shows the "thousands of products (including tens of thousands of component parts in them) that Square D manufactured in a given year, any number of which could be included in a piece of 'switchgear.'"  (Square D Br. 4-5).

In response, Plaintiff argues that Balcerzak "in fact testified to working on numerous types of asbestos-containing products manufactured by Square D, to which he attributes his exposure to asbestos."  (Pl. Square D Opp. 1-2). Specifically, Plaintiff notes that Balcerzak "testified to working with and around various [Square D] equipment" — including switchgear, arc chutes, limit switches,[16] and contactors — at "all of [his] various jobsites," and he identified Square D equipment based on its nameplate and logo.  (*Id.* at 2-3; Pl. 56.1 Response ¶ 164).  On this basis, Plaintiff submits that there are genuine issues of material fact foreclosing summary judgment.  (Pl. Square D Opp. 2-3).

---

[16]    During his deposition, Balcerzak recalled repairing and replacing limit switches manufactured by Square D while at Reynolds Metals, but he indicated at least twice that he did not believe these tasks exposed him to asbestos.  (Balcerzak Tr. 652, 655, 966).  Accordingly, the Court will focus on Balcerzak's alleged exposure to other allegedly asbestos-containing equipment.

Both sides agree that Balcerzak testified that he worked on Square D switchgear.  (Balcerzak Tr. 971, 975).  He stated that this switchgear served numerous purposes, including powering motor rooms, individual motors, transformers, and remelt furnaces.  (*Id.* at 975).  Further, Balcerzak testified as to his belief that he was exposed to asbestos through the process of repairing this switchgear — specifically, "blowing out" the damaged arc chute component parts using compressed air, which created "[asbestos] dust in the air."  (*Id.* at 984-85, 989-90).  That said, Balcerzak did not specifically recall where in his career he witnessed or aided in blowing out damaged arc chutes from Square D switchgear.  (*Id.* at 989, 995).

When asked to describe the arc chutes found within Square D switchgear, Balcerzak described them as approximately four inches wide by two inches thick, and he indicated that they were smooth and "[p]robably a whitish-gray," but could be "[m]ore of a fiber" or "stranded" appearance when worn.  (Balcerzak Tr. 991-93).  Balcerzak believed these arc chutes were manufactured by Square D because he recalled seeing the words "Square D" or the company's logo on the box of replacement arc chutes.  (*Id.* at 997-98).  Balcerzak also recalled seeing "Square D" or the company's logo on a nameplate mounted on or inside of switchgear.  (*Id.* at 1029-30).

This Court is bound, on summary judgment, to "construe the facts in the light most favorable" to Plaintiff and to "resolve all ambiguities and draw all reasonable inferences against" Defendant.  *Dallas Aerospace, Inc.*, 352 F.3d at 780.  Here, Balcerzak described with some particularity the Square D product

line with which he worked, and he proffered a theory as to how that product line potentially exposed him to asbestos.  Although Square D contests this testimony, maintaining that Balcerzak's identification of "switchgear" and "arc chutes" is too imprecise to survive a motion for summary judgment, the Court finds that the detail with which Balcerzak identified and described the switchgear raises a "reasonable inference[]" that Balcerzak was exposed to a Square D product.  *Id.*  In so finding, the Court rejects Square D's arguments, made with reference to its catalog, that the terms "switchgear" and "arc chutes" were entirely too general to put Square D on notice of the alleged product or products at issue.

### b.   Plaintiff Has Presented Inadequate Evidence Concerning Balcerzak's Exposure to Square D Products During Any Particular Time Period

Identification of products is not, however, the end of the inquiry.  Square D further argues that Plaintiff "has provided no evidence to connect any allegedly injurious product to any period of time, employer, or location," only alleging that "all manufacturers were represented at all worksites throughout his forty-four year career."  (Square D Br. 5).  This argument has greater traction.  When asked during his deposition where he worked with Square D's switchgear, Balcerzak could only respond, "I cannot get a specific place, but *it could be* one or all of the places where I worked," except the City of Phoenix and Western Electric.  (Balcerzak Tr. 977 (emphasis added)).  When pressed, Balcerzak stated:  "I worked at many companies and doing many things.  They could be at — like I said, at one of them; more likely than not at several of

them.  But if you're saying specific, I cannot say, and I don't remember.  And I also don't remember the date." (*Id.* at 978).  Balcerzak testified with no greater specificity as to where he encountered Square D switchgear products.  Without more evidence tying its products to Balcerzak's employment, Square D argues, Plaintiff's claims cannot stand.  (Square D Br. 5-6).

As discussed above, courts within the Second Circuit have relaxed the product identification requirements for asbestos exposure cases, permitting plaintiffs to present circumstantial evidence of causation and of the presence of a defendant's product at a particular location.  *See Johnson*, 899 F.2d at 1286-87; *O'Brien*, 944 F.2d at 72-73; *Kreppein*, 969 F.2d at 1426.  In some cases, co-worker testimony or similar documentation can fill in any gaps in a plaintiff's memory and thereby substantiate the plaintiff's claims.  In other cases, evidence circumscribing the period of time within which a plaintiff was exposed to asbestos can enhance the likelihood that products encountered during that period were causally connected to a later asbestos-related illness.  Here, however, Balcerzak could do neither:  Balcerzak was simply unable to connect his exposure to *any* particular time, place, or employer, repeatedly speaking in terms of what "could be" and linking it with "one or all" of his many employers. (Balcerzak Tr. 974, 976-78).  This inexactitude far exceeds the leeway afforded asbestos plaintiffs under the law.

Unlike cases in which a plaintiff introduces co-worker testimony substantiating the presence of particular companies' products during the time and place of that plaintiff's employment, Plaintiff here offers no analogous

29

corroborative evidence.  As a result, Square D is left in the untenable position of defending itself against alleged exposure at a laundry list of worksites over a protracted period of time.  According to an affidavit submitted by Balcerzak in a prior asbestos claim, he worked at a total of 15 locations between 1956 and 1979, the period during which he believed he was exposed to asbestos.  (LaSala Aff. Ex. Q).  Balcerzak further testified as to his belief that he was exposed to asbestos from Square D's switchgear at all of these jobs except two — the City of Phoenix, where he worked for approximately six months, and Western Electric, where he also worked for about six months.  (Balcerzak Tr. 454, 700). Thus, during the course of approximately 23 years, Balcerzak has eliminated only about one year from possible exposure to Square D products, leaving approximately 22 years and 13 jobsites where he may or may not have worked with asbestos-containing products manufactured by Square D.[17]

While it is unfortunate for Plaintiff that Balcerzak could not identify co-workers or supervisors to testify to the specific presence of asbestos-containing products manufactured by Square D at any of his prior places of employment, permitting his claims to go forward against Square D based solely on Balcerzak's vague allegations would deny Square D a fair opportunity to defend itself.  *See In re Joint E. & S. Dist. Asbestos Litig.*, 1993 WL 97301, at *2 ("[T]he

---

[17]     During his deposition in the instant matter — and in contrast to his affidavit in the prior matter — Balcerzak repeatedly testified that he believed he was exposed to asbestos from Defendants' products at "one or all of the places" where he worked; his full job history spans 1957 until 2000, and includes 21 jobs.  (Def. 56.1 ¶¶ 2-3).  Since a longer and broader job history only further highlights Plaintiff's inability to identify a genuine issue of material fact, the Court considers the narrower job history referenced by Balcerzak's prior affidavit.

plaintiff must show *some* circumstantial evidence that he was at the approximate place and approximate time during which the defendant's product was used" (emphasis in original)); *see also Scheidel*, 685 N.Y.S. 2d at 831 (granting summary judgment where "decedent was unable to provide responses to interrogatories or deposition testimony as to the location or timing of his alleged exposure to [defendant's] products").

Consequently, although it disagrees with Square D as to the sufficiency of Plaintiff's product identification, the Court nonetheless finds that Plaintiff has not raised an issue of fact connecting a Square D product to any particular employer or time period.  Requiring Square D to prove a negative — to demonstrate as a matter of law that it could not have exposed Balcerzak to asbestos at each and every one of his places of employment over a period of decades — would constitute a perversion of the summary judgment standard. Accordingly, Square D's motion for summary judgment is granted.

### 3.     Summary Judgment Is Not Warranted as to Allen-Bradley

In seeking summary judgment, Allen-Bradley argues that Plaintiff bases its alleged liability on three exposure scenarios — namely, Balcerzak (i) working on Allen-Bradley switchgear, (ii) removing and replacing arc chutes included in Allen-Bradley's contactors, and (iii) removing and replacing insulation on Allen-Bradley's contactors — none of which is possible.  (Allen-Bradley Br. 2-5). According to Allen-Bradley, Plaintiff misidentifies the subject products as manufactured by it, and thus, the Court must grant summary judgment in its favor.  (*Id.* at 5).  Here, however, the materials submitted by Allen-Bradley come

close, but do not overcome the genuine issue of material fact raised by Plaintiff concerning Balcerzak's exposure to asbestos while working with certain Allen-Bradley products. For this reason, Allen-Bradley's motion for summary judgment is denied.[18]

### a.   The Court Will Consider the Affirmation and Supplemental Affirmation of Stan Ho and the Affirmation of Joseph LaSala

Concurrent with her opposition to Allen-Bradley's motion for summary judgment, Plaintiff submitted a document styled as "Evidentiary Objections to, and Motion to Strike, Evidence Submitted in Support of Defendant Rockwell Automation, Inc., as successor-in-interest to Allen-Bradley Company LLC's Motion for Summary Judgment" ("Pl. Mot. Strike"). In it, Plaintiff argued that the two affirmations of Allen-Bradley's corporate representative Stan Ho, and the one affirmation of its counsel Joseph P. LaSala, were inadmissible. (Pl. Mot. Strike 2). Specifically, Plaintiff argued that neither Ho nor LaSala had "personal knowledge" of the facts at issue, and thus, they were not competent to testify. (*Id.* at 2-3). Further, Plaintiff claimed that Ho and LaSala proffered impermissible legal conclusions under the guise of factual assertions. (*Id.*).

A "court may strike portions of an affidavit that are not based upon an affiant's personal knowledge, contain inadmissible hearsay or make generalized

---

[18]   Significantly, unlike Defendant Square D, Allen-Bradley has not argued on summary judgment that Plaintiff falls short of alleging a sufficient connection of its products to any particular time, place, or employer. Nor did it join in any of its co-movants' arguments in that regard. The Court will not consider arguments not raised by the moving party. Accordingly, although Balcerzak hardly recollected Allen-Bradley products in connection with more particularized locations and time periods, the Court does not consider this as a ground on which it may grant summary judgment.

and conclusory statements." *Searles* v. *First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (internal citations omitted); *accord United States* v. *Alessi*, 599 F.2d 513, 514-15 (2d Cir. 1979). Nonetheless, it is "axiomatic that a corporate representative may testify and submit affidavits based on knowledge gained from a review of corporate books and records." *Harrison-Hoge Indus., Inc.* v. *Panther Martin S.R.L.*, No. 05 Civ. 2851 (JFB) (ETB), 2008 WL 905892, at *28 (E.D.N.Y. Mar. 31, 2008). "Thus, to the extent [Ho's affirmation] is based upon his review of [Allen-Bradley's] books and records, or other documents he reviewed in his official capacity as corporate representative, it can be considered under Rule 56(e)." *Id.* As Ho affirms, (i) he has testified as Allen-Bradley's corporate representative previously and (ii) he has "perform[ed] research regarding current and historic products manufactured, sold and/or distributed by Allen-Bradley," rendering him "fully familiar with and knowledgeable about Allen-Bradley historic product lines." (LaSala Aff. Ex. S at ¶¶ 3, 5). Thus, this Court finds Ho competent to testify.

Additionally, it is "well established that an attorney's affidavit can be used, in connection with a summary judgment motion, to place documents produced in discovery before the Court." *Harrison-Hoge Indus., Inc.*, 2008 WL 905892, at *27 (collecting cases). That is essentially what LaSala did in his affirmation, and the Court is capable of discerning from that affirmation what statements were made on the basis of LaSala's firsthand knowledge; what statements are summaries of evidence in the record; and what documents the Court should review in determining the accuracy of those summaries.

Thus, the Court has evaluated whether the two affirmations are based on "personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements," *Searles*, 98 F. Supp. 2d at 461, and it has concluded that the affirmations of Stan Ho and Joseph P. LaSala are admissible. Plaintiff's Motion to Strike is denied in its entirety.

### b. Plaintiff Has Not Raised a Genuine Issue of Material Fact as to Balcerzak's Exposure to Asbestos in Allen-Bradley Switchgear

During his deposition, Balcerzak testified that he had been exposed to asbestos through his work with Allen-Bradley switchgear; as with Square D switchgear, Balcerzak indicated that he worked with this equipment at "[e]very place in [his] career." (Balcerzak Tr. 922-23).  At one point in his deposition, Balcerzak was asked whether he was referring to "high-voltage switchgear … that would be accepting power from the outside and sending it out to a building or location," and he confirmed this.  (*Id.* at 923).  Balcerzak clarified that the voltage for this switchgear would range from 480 to 13,800 volts.  (*Id.*). He was then asked again whether "every place in [his] career had Allen-Bradley high-voltage switchgear that was between 480 and 13,800 volts," and whether "every place in [his] career had Allen-Bradley high-voltage switchgear that was accepting power from the outside and distributing it to a particular building or series of buildings." (*Id.* at 924).  Balcerzak responded "yes" to both questions. (*Id.*).

Corporate representative Stan Ho avers that Allen-Bradley did not manufacture the specific type of switchgear about which Balcerzak testified:

34

> I have reviewed excerpts of Raymond Balcerzak's deposition testimony in which he alleges that he performed preventive maintenance on Allen-Bradley "switchgear" during his career as an electrician. He described the switchgear as the equipment that brought in high-voltage electric current from the outside substation and distributed that power throughout a building. Based on my thorough knowledge of Allen-Bradley product lines, I can testify that Allen-Bradley did not manufacture, sell or distribute switchgear as described by Mr. Balcerzak.

(LaSala Aff. Ex. S ¶ 7). Plaintiff contests the sufficiency of Ho's statements, arguing that the affirmation falls short because Ho fails to describe any switchgear that Allen-Bradley *did* manufacture. (Pl. Allen-Bradley Opp. 12-14). However, whether Allen-Bradley manufactured other switchgear, not referenced by Balcerzak, is irrelevant to the question of Balcerzak's exposure *vel non* to the switchgear to which he actually referred during his deposition.

Next, Plaintiff takes issue with Ho's reference to "high-voltage electric current" in his description of the alleged switchgear, noting that Balcerzak described switchgear ranging from 480 to 13,800 volts. (Pl. Allen-Bradley Opp. 12; Balcerzak Tr. 923). Plaintiff contends, citing testimony from Ho in a separate case, that this represents a range of "low" to "ultra-high" voltage. (Pl. Allen-Bradley Opp. 12). Although the Ho Affirmation is regrettably sparse, the Court sees no basis to conclude that Ho reviewed and referenced only snippets of Balcerzak's deposition transcript. Indeed, the switchgear was repeatedly called "high-voltage" on the very same page that Balcerzak defined that range as 480 to 13,800 volts. (Balcerzak Tr. 923). And, given the number of times the parties each explicitly mentioned that full range of voltage — 480 to 13,800

volts — and labeled it "high-voltage" (*see, e.g.*, *id.* at 922, 923, 924), the Court can only conclude that Ho was simply adopting the parties' definition of the term.  Those challenges resolved, the Court accepts Ho's testimony, and concludes that Plaintiff has not demonstrated Balcerzak's exposure to Allen-Bradley switchgear.[19]

c.     **Plaintiff Has Raised a Genuine Issue of Material Fact as to Balcerzak's Exposure to Asbestos While Repairing and Replacing Arc Chutes in Allen-Bradley Contactors**

i.     **Plaintiff Has Adequately Identified Allen-Bradley Products**

Next, Allen-Bradley disputes that Balcerzak was exposed to asbestos during his work removing and replacing arc chutes from Allen-Bradley contactors.  (Allen-Bradley Br. 4-5).  In his deposition, Balcerzak stated that he would inspect these arc chutes, and if they were frayed or no longer properly coated, he would replace them.  (Balcerzak Tr. 929-30).  Balcerzak believed that his work on these arc chutes exposed him to asbestos.  (*Id.*).  Balcerzak was then asked about the arc chutes, "[w]hen you pulled them out, did they

---

[19]     Plaintiff also argues that her "evidence establishes a substantial similarity" between Allen-Bradley switchgear described by Ho in an unrelated deposition and the switchgear described here by Balcerzak.  (Pl. Allen-Bradley Opp. 13-14 (citing Stolzman Decl. Ex. 3 at 14-15)).  During that earlier deposition, however, Ho actually stated that he "worked in the department that manufactured prefabricated control houses that *house switch gear.*"  (Stolzman Decl. Ex. 3 at 14-15 (emphasis added)).

Ho had been asked to provide a "general understanding of … what comprises switch gear," and he responded, "[i]n general terms, switch gear could be a number of different apparatus that basically took utility power and allowed it to control and distribute it to other pieces of equipment throughout the plant."  (*Id.*).  Ho in no way indicated that Allen-Bradley manufactured the switchgear itself; on the contrary, he reiterated that "Allen-Bradley manufactured at the time of my employment, the division that basically designed and fabricated metal control houses which basically were metal buildings that would house electrical equipment."  (*Id.*).  Plaintiff has taken this testimony out of context, when in fact it supports Allen-Bradley's position in the instant matter.

just snap out and snap back in?" (*Id.* at 930).  He responded, "[m]ost of them just snap in, snap out." (*Id.*).

In seeking summary judgment, Allen-Bradley argues that Balcerzak misidentified these arc chutes as an Allen-Bradley product because, it claims, Allen-Bradley arc chutes did *not* snap in and out, but rather attached by metal screws.  (Allen-Bradley Br. 9).  In making this argument, Allen-Bradley relies wholly on the Ho Affirmation, which states in relevant part:  "Finally, Mr. Balcerzak stated that he might have been exposed to asbestos from replacing 'arc chutes' on some contactors.  He stated that these arc chutes snapped on and off.  'Arc chutes' on Allen-Bradley contactors did not snap on and off but were attached with metal screws."  (LaSala Aff. Ex. S ¶ 12).

Contesting this, Plaintiff argues that the Ho Affirmation does not clearly refute Balcerzak's deposition testimony; Balcerzak testified only that "*most* of [the arc chutes] just snap in, snap out."  (Pl. Allen-Bradley Opp. 14-15; *see* Balcerzak Tr. 930 (emphasis added)).  Indeed, Plaintiff states, it was Allen-Bradley's counsel who initially put forth the "snap out and snap back in" language, and it was Allen-Bradley's counsel who failed to adduce (or elected not to adduce) whether there were other methods by which arc chutes could be removed and replaced.  (Pl. Allen-Bradley Opp. 15).  In any event, neither side probed Balcerzak's understanding of what "snap in, snap out" would mean in practice.  (Balcerzak Tr. 930).

As a result, the Court finds there is a genuine issue of material fact as to whether Balcerzak repaired and replaced any arc chutes in Allen-Bradley

contactors.  While the Court accepts as true Ho's statement that Allen-Bradley

arc chutes attached by metal screws, Plaintiff nonetheless "set[s] forth specific

facts showing that there is a genuine issue for trial" on this point.  *Anderson*,

477 U.S. at 248.  Accordingly, summary judgment must be denied.

> **ii.    On this Record, Plaintiff Has Presented a Genuine Issue
> of Material Fact as to Balcerzak's Exposure Through
> Replacement of Asbestos Backing on Allen-Bradley
> Contactors**

Although the rejection of Allen-Bradley's argument regarding arc chutes

is sufficient to warrant denial of its summary judgment motion, the Court

takes this opportunity to address the company's related argument regarding

Balcerzak's replacement of asbestos-containing insulation on the backing of

Allen-Bradley contactors.  At his deposition, Balcerzak recalled using Bakelite-

type insulation on the "backing" of certain Allen-Bradley contactors;

specifically, the contactor would be mounted on a Bakelite substance, which

would then attach to the metal housing.  (Balcerzak Tr. 931-32).  When asked

to describe the "backing" of a contactor, Balcerzak stated that "[i]t would be the

back part of the contactor that the contactors are mounted to."  (*Id.* at 932).

Counsel for Allen-Bradley attempted to clarify this description, asking whether

"the Allen-Bradley reversing contactor would have its own metal enclosure and

you're saying between the contactor and the back of the metal enclosure there

would be a piece of Bakelite."  (*Id.*).  Balcerzak confirmed this description.  (*Id.*

at 933).

In its motion, again relying on the Ho Affirmation, Allen-Bradley argues

that its "contactors did not require and were not manufactured with an

insulating material between the contactor and its metal enclosure.  Allen-

Bradley contactors were designed to eliminate the need for any insulation and

were designed for a metal-to-metal installation."  (Allen-Bradley Br. 5).

However, the Ho Affirmation is not so clear.  As it states:

> Prior to the early 1930s, all known Allen-Bradley motor
> controllers and contactors typically had a slate backing
> board or backing plate.  After the early 1930s, all known
> Allen-Bradley motor controllers and contactors typically
> had backing plates made of metal for purposes of
> structural integrity and so that if there is a dielectric
> failure, any short will go to ground through the metal
> backing plate.

(LaSala Aff. Ex. S ¶¶ 8-9).  Later on, Ho affirms:

> I have reviewed excerpts of Raymond Balcerzak's
> deposition testimony in which he described Allen-
> Bradley "contactors."  However, Mr. Balcerzak claimed
> exposure to asbestos from replacing pieces of a
> "bakelite" material between the metal back of the
> contactor and the metal shell of the enclosure that
> housed it.  He testified that he would obtain this
> "bakelite" product from the tool room or stockroom of
> his various employers.  Again, Mr. Balcerzak is not
> describing an Allen-Bradley product.

(*Id.* at ¶ 11).

    Ho concludes that the use of a metal backing for Allen-Bradley

contactors precludes Balcerzak's exposure to asbestos via replacement of a

Bakelite material attached to that backing.  But nowhere in his Affirmation

does Ho actually state that this metal backing did not — and more importantly,

could not — accommodate Bakelite between the backing and the metal

housing.  On the contrary, Ho's description of the contactor matches that given

by Balcerzak; they both indicate that the contactor was metal, as was the housing.  (LaSala Aff. Ex. S ¶ 9; Balcerzak Tr. 932).

The Ho Affirmation also appends advertisements from 1933 and 1934, purporting to show "that Allen-Bradley switched from using slate backing plates to metal backing plates."  (LaSala Aff. Ex. S ¶ 10).  However, the Court does not see how these advertisements — which predate by several decades any exposure of Balcerzak to asbestos — preclude the possibility that Allen-Bradley contactors used asbestos-containing insulation *between* the metal backing and the metal housing, as Balcerzak testified.

Put simply, the Ho Affirmation leaves open the possibility that Balcerzak was exposed to asbestos during the maintenance and repair of Allen-Bradley contactors.  It does this in two ways:  First, it fails to substantiate the "metal-to-metal" structure described in Allen-Bradley's motion (Allen Bradley Br. 5); more specifically, it fails to refute Balcerzak's testimony of a "metal-to-Bakelite-to-metal" structure.  Second, it rests on the proposition that Balcerzak "is not describing an Allen-Bradley product," a proposition in which the Court cannot be confident on this record.  (LaSala Aff. Ex. S ¶ 11).  The daylight between Balcerzak's testimony and the Ho Affirmation bespeaks a genuine issue of material fact, and would constitute a second basis for denial of the summary judgment motion.[20]

---

[20]   The Court anticipates a consequent issue of whether Allen-Bradley could be subject to a duty to warn of the dangers of Bakelite insulation (manufactured by other companies) installed on its contactors.  New York law imposes on manufacturers a duty to warn "against the dangers of a third party's product that might be used in conjunction with its own" where that third-party product "is necessary for the manufacturer's product to function" or where the "manufacturer knows that its product will be outfitted with a

### 4. The Unopposed Motions of Buffalo, Byron Jackson, and Gardner Denver Are Granted

In addition to the three contested motions discussed in this section, three other defendants have filed unopposed motions for summary judgment. Nonetheless, even where summary judgment is unopposed, "the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law." *Vt. Teddy Bear Co., Inc.* v. *1-800 BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (internal quotation marks omitted). Here, Buffalo, Byron Jackson, and Gardner Denver have made sufficient showings that there are no genuine issues of material fact, and they are entitled to judgment as a matter of law.

#### a. Summary Judgment Is Warranted as to Buffalo

At the outset, Buffalo argues that maritime law applies to its motion. Based on *Keene*, 700 F.2d at 844, maritime jurisdiction could only lie with respect to Balcerzak's time aboard the U.S.S. Lake Champlain, as the Court has already concluded that the U.S.S. Constellation was not operable and on navigable waters during Balcerzak's tenure. (*See* Balcerzak Tr. 390, 1020). Even with regard to the U.S.S. Lake Champlain, however, the Court is not certain, based on the parties' submissions and the law of the Second Circuit,

---

third party's defective product pursuant to contract specifications." *Surre* v. *Foster Wheeler LLC*, 831 F. Supp. 2d 797, 801 (S.D.N.Y. 2011). Alternatively, where the manufacturer has "no control over the production" of the defective product, "[does] not place it into the stream of commerce," and does not "play[] any role in selecting" that third-party product, the law does not impose a duty to warn. *Id.* (citing *Rastelli* v. *Goodyear Tire & Rubber Co.*, 79 N.Y. 2d 289 (1992)). This issue, too, hinging on Allen-Bradley's instructions and knowledge as to its own products, is a separate issue of fact to be resolved by a jury.

41

whether Buffalo's products were "designed specifically" for maritime use.  *See*

*Keene*, 700 F.2d at 844.  Nonetheless, the Court need not make this

determination, as Plaintiff fails to establish product identification, requisite

even under the more plaintiff-friendly New York standard.

Defendant Buffalo contends that there are no issues of material fact and

that it is entitled to judgment as a matter of law, since Balcerzak failed to

identify its product at any place of employment.  (Def. 56.1 ¶ 45).  Although

Balcerzak indicated that he worked aboard two ships on which pipefitters and

millwrights installed and repaired pumps, he did not know the manufacturer or

brand of these pumps.  (*Id.* at ¶¶ 46-50).  At one point, Balcerzak referenced

Ingersoll-Rand and Worthington Pumps, but he did not actually know where

these pumps were used.  (*Id.* at ¶ 51).

Buffalo correctly argues that "Plaintiff has failed to proffer any evidence

that [Balcerzak] was exposed to asbestos fibers released from any asbestos-

containing products manufactured, sold, distributed or otherwise attributable

to Buffalo."  (Buffalo Br. 1).  Plaintiff has not responded with any evidence to

refute this, and while Defendant "anticipates that Plaintiff may rely upon US

Navy records in an attempt to argue that Buffalo pumps were aboard some of

the ships at issue" (*id.* at 2), Plaintiff has introduced no records (and certainly

no admissible records) on this point.

Because Plaintiff has failed to offer any evidence that Balcerzak was

exposed to Buffalo products, including any deposition testimony by Balcerzak,

the Court need not consider whether Buffalo-manufactured products could

have been a "substantial factor" in causing Balcerzak's illness.  *See Johnson*, 899 F.2d at 1285-86.  Under either maritime or New York law, Plaintiff must establish the role of Buffalo products in injuring Balcerzak, and Plaintiff plainly has not done so.  Accordingly, Buffalo's motion for summary judgment is granted.

### b.   Summary Judgment Is Warranted as to Byron Jackson and Gardner Denver

Defendants Byron Jackson and Gardner Denver, moving jointly for summary judgment, argue that they are entitled to same because Balcerzak failed to identify their products as sources of his asbestos exposure in his interrogatory responses, including his "Jobsite Specific Exposure History," or in his deposition testimony.  (Def. 56.1 ¶¶ 53, 131; Byron Jackson/Gardner Denver Br. 2, 5).  In July 2014, Plaintiff forwarded to each of these parties a "purported ship record that was the alleged basis" for her "refusal to discontinue" these actions (Markowitz Decl. Ex. B; Dean Decl. Ex. H), but these documents were not disclosed until two months after the close of fact discovery.  (Def. 56.1 ¶¶ 57, 59, 136-38).  For the reasons set forth above with regard to the other exhibits in the Stolzman Declaration, *see supra* at 18-21, these documents will not be considered on summary judgment.

Accordingly, in the absence of evidence of Balcerzak's exposure to Byron Jackson or Gardner Denver products at any worksite during his career, the joint unopposed motion of Byron Jackson and Gardner Denver for summary judgment is granted.

**CONCLUSION**

For the reasons discussed herein, the summary judgment motions of Defendants Warren, Square D, Buffalo, Gardner Denver, and Byron Jackson are GRANTED, and the summary judgment motion of Defendant Allen-Bradley is DENIED.  The Clerk of Court is directed to terminate the motions at docket entries 214, 217, 228, 231, 239, and 257.

The parties remaining in this litigation are ORDERED to appear for a pretrial conference on Wednesday, April 20, 2016, at 3:00 p.m., in Courtroom 618 of the Thurgood Marshall Courthouse, to discuss next steps in this litigation.

SO ORDERED.

Dated:      March 22, 2016
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

44